WALLACE, Appellant, v. DUNTON et al, Respondents.

(139 N. W. 345.)

1. **Trusts—Resulting Trust—Burden of Proof—Legal Title— Sufficiency of Evidence.**

In a suit involving a resulting trust in land, claimed on behalf of plaintiff, the burden is on the person asserting such trust as against the legal title, to prove that the purchase was made with money belonging to him.

2. **Same—Purchase of Land with Money of Another—Presumptions.**

Where decedent paid for land with money in his own possession, but caused the title to be taken in the name of his brother, no presumption arose, upon those facts, that the brother held as a resulting trustee for decedent, under Sec. 303, Civ. Code; nor was such evidence alone sufficient to establish such resulting trust.

3. **Same—Presumption in Favor of Resulting Trust.**

Were it not for the fact that the person paying such purchase price himself caused the deed to be taken in the name of the brother, a fair assumption would arise, in absence of other evidence, that the money in possession of him who paid it belonged to him. Dictum.

4. **Real Property—Adverse Possession—Burden of Proof—Sufficiency of Evidence.**

The burden of showing title to realty by adverse possession rests upon the party claiming it. Held, further, that the record in this case fails to show sufficient evidence of adverse claim upon which to found such title.

5. **Real Property—Limitations—Adverse Possession—Adverse Right—Leasing—Paying Taxes—Evidence.**

Where decedent purchased land, had deed thereto made in name of his brother, and thereafter controlled and leased the land, which was assessed in his name, and paid taxes thereon for a long series of years, but decedent's possession was in recognition of and subject to the title and ownership of his brother, decedent did not, by such use of the land and payment of taxes, acquire a valid claim by adverse possession.

6. **Estoppel—Necessity of Pleading—Reply.**

Where, in a suit to determine an adverse claim to land, defendant filed a counterclaim of title, a claim that defendant was estopped by laches from claiming title should have been raised by reply.

7. **Real Property—Quieting Title—Estoppel by Laches—Evidence—Silence.**

Where decedent purchased property, causing deed to same to be taken in his brother's name, in May, 1887, and until his death in 1902 was in possession and controlled the land in sub-

ordination to the brother's legal title, but there was no shcw-
ing that decedent had expended money for or made improve-
ments on the land or had done any act detrimental to the legal
title, and no adverse claim appeared until the land was award-
ed to decedent's widow in 1910, **held**, that in the light of these
facts, mere silence on the part of the brother did not give rise
to an estoppel by laches as against him

(Opinion filed January 6, 1913.)

Appeal from Circuit Court, Day County. Hon. J. H. Bot-
tum, Judge.

Action by Diana E. Wallace against George C. Dunton, as
administrator, etc., of Edward C. Wallace, deceased, and others, to
determine adverse claims to land. From a judgment for defend-
ants, on a trial to the court, plaintiff appeals. Affirmed.

*H. H. Potter,* and *Campbell & Walton,* for Appellant.

If Samuel C. Wallace in fact paid the purchase price for the
land at the time he purchased it in 1887, and took the title in the
name of Edward C. Wallace, then the equitable title was in Sam-
uel C. Wallace pursuant to the provisions of section 303 of the
Civil Code.

The reasons which lead irresistibly to the conclusion that
Samuel C. Wallace paid for this land with his own means and
for his own benefit, are as follows:

He alone conducted the negotiations surrounding the pur-
chase; he paid, personally, the purchase price; neither Edward C.
Wallace nor any representative of his was present or participated
in the transaction; Edward C. Wallace was never known to have
visited South Dakota; Samuel C. Wallace must necessarily have
recorded the deed himself, as it was recorded on the same day it
was executed. (Page 496 Record.) There is not in the record
anywhere the slightest intimation that the deed was ever delivered
to Edward C. Wallace or that he ever saw it, had it in his posses-
sion, or knew of its existence. Immediately after the execution
of the deed, Samuel C. Wallace went into possession, broke up a
part of the land which was unbroken, rented and supervised the
land from year to year as any man would ordinarily and natural-
ly do with real estate that was his own, harvested and sold the
crop raised thereon from year to year, took and enjoyed the pro-
ceeds himself, paid all expenses for hauling and threshing grain
raised thereon, had the land regularly assessed to himself, and

for twenty-three years he, and his widow, claiming through him, regularly paid all taxes on the land. On two different occasions he looked the farm over with a view of selecting a building spot and erecting a dwelling thereon. He bought with his own means and took title in his own name, of twenty-two acres which was a part of the quarter section used as a race track or fair ground, so as to square out and thus add to the value of his farm. He on numerous occasions referred to this land as his farm, and told various persons that it was his, thus characterizing his possession. That his possession and the possession of his widow through him after his death, was open, notorious and continuous from 1887 to the time of the trial in 1911, a period of twenty-four years, is not disputed or attempted to be disputed by the evidence.

There is not the slightest evidence that he, during the years of his life, or that of his daughter, Lena W. Cunningham, after his death, covering the years from 1887 to 1910—a period of twenty-three years—ever claimed or suspected that they owned or had any interest in this land or in any land in South Dakota. If Edward C. Wallace sent money to his brother in South Dakota to buy or invest in land, there would naturally be in existence some acknowledgement by Samuel C. Wallace of its receipt by him, and there would necessarily be some records by which the payment of such money could have been established; yet the record is entirely devoid of any evidence of this character. If, during the fifteen years intervening between the purchase of this land and the death of Samuel C. Wallace in 1902, the latter had been looking after this land and farming it for Edward C. Wallace and not for himself, there must of necessity have been correspondence between Samuel C. Wallace and his brother concerning it, and the letters could have been producd, or if lost, secondary evidence of their contents. Yet nothing of this sort was introduced or attempted.

It is exceedingly probable that if Edward C. Wallace had died in fact owning a farm in South Dakota, his daughter and sole heir, residing in the same place, would have had some knowledge or intimation of the fact, and if she had any such knowledge or intimation, it is inconceivable that she should have made no claim or inquiry concerning it until 1910—thirteen years after the

death of her father in 1897—yet nothing of this kind is even attempted.

The defendant Lena W. Cunningham does not appear as a witness at the trial; neither is any deposition by her offered.

The defendant Lena W. Cunningham knew of the death of Samuel C. Wallace in 1902, because notice of application for proof of his will was both published and served upon her; she was charged with notice of the proceedings taken in the settlement of his estate; and was charged with notice that the final decree pursuant to the will, vested or undertook to vest title to the particular land in controversy in Diana E. Wallace. A certified copy of this decree has also been a matter of record in the office of the register of deeds of Day county since 1903. Yet not until 1910 and about a year before the trial of this action, does she offer any claim to it, and then and on April 27, 1910, she presents to the county court of Day county a petition asking administration of her father's estate, alleging that he died owning the land in controversy.

From this evidence, or rather from this lack of evidence, it seems to us impossible to reach any conclusions regarding the ownership of this land, except as follows:

First—That Edward C. Wallace in fact never bought or paid for the land in controversy.

Second—That he never knew prior to his death that the record title to this land was in him, or if he did know it, he also knew that while the record title was in him, the land in fact belonged to Samuel C. Wallace; and

Third—That the defendant, Lena W. Cunningham, never knew that her father held the record title to the land or that she as his sole heir had of record, or otherwise, any claim to it until the spring of 1910.

We do not desire to discuss at length the evidence of defendant's witnesses who claim that Samuel C. Wallace, years ago and about the time and shortly after the making of the deed in question, intimated or said to them that the land was not his, but was his brother's. We have no doubt most of these witnesses intended to be truthful and that something of that character was said to them by Samuel C. Wallace. If as a matter of fact he had put this land in the name of his brother to avoid the un-

just demands which a divorced wife, who had been guilty of infidelity, was making or was likely to make, against him, it would be the most natural thing to expect that. if he spoke of it at all, he would carry out the intention in making the. deed, and by statements lead people to believe that the land belonged to his brother or to some one besides himself.

Martin Giblin testifies that Samuel C. Wallace distinctly told him a year or two after he got possession of the land, and in 1888, 1889 or 1890, that he did not own the land and that it belonged to his brother who lived in the east. (Pages 235-237 Record.)   Yet when the witness assessed the land for taxation in 1897, he assessed it to Samuel C. Wallace.

Again, the testimony of A. E. Barker, a witness for the defendant, clearly indicates that Edward C. Wallace did not in fact buy or pay for this land.. He testifies that Samuel C. Wallace stated to him as follows: "Mr. Wallace said he had a widowed sister down home whom he had to support, and he thought that the income from this land would enable his brother to help support her." (Page 226 Record). In this same conversation he is alleged to have stated to the witness, Barker, as follows: "He told me of the death of his wife and children down in New York state and the sorrow which it caused him, of his second marriage and the infidelities of his second wife, and the particulars of the divorce proceedings which followed." It is clear from the conversation that he at that time had in mind as a reason for taking the deed in the name of Edward C. Wallace, the unjust demands that the divorced wife who had been unfaithful to him, might make against him.

Further, we contend that whatever the character of Samuel C. Wallace's possession up to the time of his death in 1902, the possession of Diana E. Wallace, his widow and sole devisee, has unquestionably at all times since been open, notorious and exclusive, and without any thought or intimation that the defendant or any person aside from herself, had any interest therein.   Her possession has been continuous and exclusive since her husband's death; she has regularly managed the same and farmed it by tenant from year to year without her rights to do so having been questioned by any person whomsoever, until 1910. It has regularly during all these intervening years been assessed to her, and she has

regularly paid the taxes thereon. By decree of the county court for Day county it was solemnly adjudged to be the property of the plaintiff, and was by final decree of that court assigned to her in 1903, a certified copy of the final decree being recorded in the office of the register of deeds of Day county in 1903, and has always since been notice to the world that plaintiff claimed title in fee to the land. From the time of Samuel C. Wallace's death in 1902 until defendant first made claim to this land in 1910, eight years had intervened without an intimation from defendant that she claimed any interest in the land, and if the possession of Samuel C. Wallace was adverse and exclusive in character, then twenty-three years have elapsed without defendant or her father in his lifetime. asserting any right thereto or interest therein.

The law is, we believe, that: "If a man knowingly, although he does it passively, by looking on, suffers another to purchase and expend money on land under an erroneous opinion of title, without making known his claim, he shall not afterward be permitted to exercise his legal rights against such person." Shelby v. Bowden, (S. D.) 94 N. W. 416; Wampole v. Kauntz, 14 S. D. 334; Murphy v. De Foe, (S. D.) 99 N. W. 86; Diamond v. Manheim, (Minn.) 63 N. W. 495; Wendell v. Van Rensslaer, 1 John. Ch. 344; Kirk v. Hamilton, 102 U. S. 68; Erwin v. Lowry, 7 How. (U. S.) 172; Close v. Glenwood Cemetery, 107 U. S. 466; State v. Graham, 21 Neb. 329; Gillespie v. Sawyer, 15 Neb. 536; Pomeroy's Eq. Jur., Sec. 965; Simmons v. Burlington & C. R. R. Co., 159 U. S. 278; Kenny v. McKenzie, (S. D.) 127 N. W. 597.

The rule of law above quoted contemplates that to be estopped one must knowingly suffer another to occupy, improve, etc. There are, however, many exceptions to the rule which are as well recognized as the rule itself, and where the circumstances are such that a party could readily have ascertained what the facts and his legal rights are, and he has failed and neglected to do so, he is just as effectively estopped and precluded as though he at all times had full knowledge thereof. The doctrine for which we contend was by this court clearly applied in the case of Shelby v. Bowden, supra. Upon this proposition see, also, McQuiddy v. Ware, 20 Wall 14, 22 L. Ed. 311; Bausman v. Kelley, (Minn.) 36 N. W. 333; Richards v. Mackall, 124 U. S. 183, 31 L. Ed.

396; Marcoth v. Hartman, (Minn.) 48 N. W. 767; Foster v. Mansfield & C. & L. R. R. Co., 36 L. Ed. 899; Johnson v. Standard Mining Co., 148 U. S. 360, 37 L. Ed. 480; Bacon v. N. W. Mut. Life Ins. Co., 131 U. S. 258, 33 L. Ed. 128; Fraker v. Houck, 36 Fed. 403; Lafferty v. Lafferty, 26 S. E. 265; Burgess v. St. Louis R. Co., 12 S. W. 1050; Higbee v. Daley, (N. D.) 109 N. W. 318; Bausman v. Fane, 46 N. W. 13; Bliss v. Pritchard, 67 N. W. 146.

In this case, if defendant suspected she had any interest in the land, she knew that during all these years she was not in possession, and made no claim to the possession or fruits of possession thereof. It necessarily follows that she at least knew some one else was in possession. She knew that she paid no taxes thereon, and necessarily knew that some one else did. She is conclusively charged with knowledge by record of the final decree of the county court in 1903 assigning to and vesting title in Diana E. Wallace, the plaintiff in this action.

"Whatever is notice enough to excite attention and put a party upon his guard, and call for inquiry, is notice of everything to which such inquiry might have led." Marcoth v. Hartman, (Minn.) 48 N. W. 767.

Upon this question last discussed, there is no conflict in the evidence, and we believe that under the undisputed evidence relating to estoppel by laches, the defendant is by law at this time clearly precluded from asserting any right to the land, and that the judgment of the trial court should be reversed and findings and judgment ordered for the plaintiff.

*Anderson & Waddel,* for Respondents.

Citing section 46 of the Code of Civil Procedure.

It is the contention of respondent that when Samuel C. Wallace took deed from Richard H. Smith and wife, to Edward C. Wallace, he did so as the brother and agent of Edward C. Wallace. And we believe there is absolutely nothing in the evidence which is inconsistent with this theory. Samuel C. Wallace resided in Day County, South Dakota, a state of cheap land. His brother, Edward C. Wallace, resided in the state of New York, a state where presumably investments were not as easily found nor so profitable when found. This deed was made in the presence of and at the solicitation, if not indeed by the personal execution

of Samuel C. Wallace.   It contains a statement therein, that the
consideration of $1,000.00 paid to the Smith people was to them
in hand paid by Edward C. Wallace.   The land is therein direct-
ly conveyed to Edward C. Wallace at the request and demand of
Samuel C. Wallace.   Under the law above cited, when Samuel C.
Wallace went into possession of this land, his possession is pre-
sumed to have been the possession of Edward C. Wallace and his
occupation of the premises is deemed to have been under and in
subordination to that legal title.

If, indeed, as we contend, the purchase price of this land
was intrusted to Samuel C. Wallace by Edward C. Wallace for
the purpose of investment, Edward C. Wallace residing in New
York state and Samuel C. Wallace living in South Dakota, then of
course, Samuel C. Wallace negotiated the purchase.   Then, of
course, he personally turned over to the grantor the purchase
price.   Then it is immaterial whether Edward C. Wallace ever
visited South Dakota or not.   Then it was most natural that Sam-
uel C. Wallace recorded the deed himself.   Then the delivery to
Samuel C. Wallace was a delivery to Edward C. Wallace whether
Edward C. Wallace ever saw the deed thereafter or not.   Then,
of course, Samuel C. Wallace went into possession, took charge
of this land and did the things which he did in carrying out his
agency for his brother.   Nor is it inconsistent that he looked the
farm over with a view to selecting a building spot.   There is no
showing as to what he wanted these buildings for.   There is no
evidence to conflict with the idea that his brother may have want-
ed improvements on the farm.   Nor is it inconsistent with this
idea that he bought twenty-two acres which was a part of this
same quarter secton of land and took a deed thereto in his own
name.   A thousand different reasons might have prompted him
to do this.   Again, we say the fact that he referred to this as his
farm was not inconsistent with the idea that in reality his brother
was the owner.   It is not at all an uncommon thing, in fact it is
the usual thing for a man who has the immediate control over pro-
perty, whether for himself or some one else to speak of it as his
property.   Nor was it unnatural that this land should be assessed
to him and that he should pay the taxes on it.

As to the witness Giblin: It is not an unusual thing that an
assessor makes his assessment follow that of his predecessor in

office. The evidence shows that the witness made this assessment in the year 1897, some ten years after the land had been deeded away by Smith, and a matter of eight or nine years after he had heard Samuel C. Wallace say that the land was not his, but belonged to his brother. According to appellant's own contention, this land had all the time after its purchase, been assessed to Samuel C. Wallace, was it then strange that Giblin so assessed it, even though he had at one time heard that it belonged to his brother?

He says Samuel C. Wallace told him that he could not sell a part of the tract for a cemetery, "Because it was not his; that it belonged to his brother and he lived in the east." He further said that he would write to his brother and find out how much he wanted for the ground. Some little time after this and after having written to his brother and received a reply, Samuel C. Wallace again stated to witness that his brother owned the land and that he would sooner not sell it for a burying ground, giving as his reason that he thought it would decrease the value of the property. One of two things must be true in reference to this conversation. First, it must have taken place about as witness says it did, on the occasion and in the manner as related, or witness must have been fabricating the whole story.

The testimony of John Winters showing that Samuel C. Wallace on several occasions remitted to his brother in the east, money, the proceeds of this particular land, is a strong circumstance to show that Edward C. Wallace must have paid the purchase price and must, in truth, have been the owner in fee of that land. The fact that he remitted this money which is shown to have been $100.00 per year for two, three or four years, is a thing that cannot be easily explained on any other theory.

Counsel for appellant contended that certain of the evidence in this case tends to show that this land was purchased by Samuel C. Wallace and kept by him as an investment, the proceeds from which should be expended on some certain dependent relative in the east. We submit that this is most remote speculation. A thing that is inconsistent with this idea in this connection is that the exact amount each year was $100.00. Had this been an investment for such a purpose as imagined by appellant, why were

not the proceeds, the amount which, on the given year, happened
to be realized from that investment?

The witness, Sheelar, testified that at a time eighteen or
nineteen years ago, when Samuel C. Wallace was at his farm to
buy seed corn, he said he was going to "plant it on his brother's
place," the Dick Smith place; "that I should leave it at Mr. Hal-
ter's place or about the field across the road from the burying
ground." "That is right across the road from the Dick Smith
place." (Record pages 293-295.) "I heard him say once he had
money from his brother up here. I borrowed $10.00 of him once.
He said it was not his, it was his brother's. He said he guar-
anteed his brother ten per cent on his money if he invested it in
land."

G. D. Peterson testifies, "He said he had bought it for his
brother, Edward Wallace."

Frank Wallace testifies that at a time when a certain gran-
ary on this land was on fire and in the presence of G. D. Peter-
son, whose evidence we have before referred to, he told Mr. Peter-
son "He would not have thought so much of it if it was his,
but it was his brother's building." (Record page 341.) At an-
other time he said that "he was paying Ed $100.00 a year for
the use of the land and when he had a crop he would have a
share of the crop and he was to pay $100.00 a year and the taxes
on the land."

David Compton testifies, "he told me it was not his. It be-
longed to his brother." (Record page 332.) "He said something
to me about having bought this land for his brother." (Record
page 336.)

L. W. Scripture testifies "he said he bought the land and it
was money he got from the east to invest for other people. He
bought for others." (Record page 367.)

It is further shown by the evidence of Samuel D. Clark that
at this time and during the times herein mentioned Samuel C.
Wallace was loaning money which belonged to his brother, Ed-
ward. (Record page 378.)

E. A. Barker testifies that at one time, while looking over the
corn field on this land, in company with Samuel C. Wallace, Mr.
Wallace stated to him, "if I owned this land I would manure it,
seed it down and pasture it and then I believe it would raise just

as good corn as is raised in Howard county, Iowa." (Record page 226.)

Hence we submit that appellant is not entitled to a reversal on the ground that she furnished the purchase price for this land.

Assuming then that Edward C. Wallace furnished the purchase price for this land and that the actual ownership at that time followed the legal title, the next question for consideration is: Did appellant, by her evidence, show possession or occupancy of this land such as would give her title by adverse possession? Samuel C. Wallace then came into possession of this land as the agent or lessee of his brother. His possession at that time was that of his brother and was under and subservient to the legal title. The only way in which this land could become the property of Samuel C. Wallace or his successors in interest, would be by twenty years adverse possession after such time as he should have changed the original relationship with his brother. Possession, in order to ripen into title must be hostile, not in the sense that the possessor must be in open warfare with the real owner, but his acts must be tortious and wrongful. They must be disloyal to the real owner. This adverse and hostile possession must be open, notorious and continuous for a period of time required by the statute of limitations which in this state is twenty years. Certainly the possession of Samuel C. Wallace was not open, notorious, adverse or hostile, during these years when he was making statements that this land was not his, but that it belonged to his brother. Appellant admits that he was undoubtedly making these statements; then she attempts to explain that they were made because he did not want it known that he claimed the land. Her contention seems to be that Samuel C. Wallace was holding this land adversely to the title of Edward C. Wallace and at the same time denying that he was doing so. He claimed to own while hiding the fact.

To begin with, the law looks upon a claim of title by adverse possession with suspicion. It demands of the one who makes such a claim that he establish clearly with a preponderance of the evidence that his possession does in every way measure up to the requirements of the rule. 1 Cyc., page 1032, and cases cited; 1 Cyc., page 997, and cases cited; Zeller's Lessee v. Eckert

et al., U. S. 11 Law Edition 979; Allen v. Allen, a Wisconsin case, reported in 16 N. W. at page 610.

Coming then to the last contention of appellant which seems to be that respondent is shut out by some rule of estoppel, we have no hesitancy in admitting the correctness of the principles and rules of estoppel laid down by counsel, but we fail absolutely to see wherein they are applicable to the case at bar.

Certainly in the case at bar, no one, either knowingly or passively, looked on while another purchased and expended money on land under an erroneous opinion of the title to that land.

Furthermore, it cannot be said, under the evidence, and under the admissions and argument of appellant that Lena W. Cunningham ever passively looked on while either of these parties expended money on that land, either in the way of purchase money, or as improvement money. On the other hand, it clearly appears that she had no knowledge of the fact that this land was hers, or that she had any interest in it whatever until shortly before the commencement of this action.

Let us see, granting all that appellant shows, we must not forget that Lena W. Cunningham lived in the State of New York; that she did not even know that her father owned land in the State of South Dakota, much less did she know the legal description of that land or the fact that lands which were shown by said petition or by the said final decree of distribution as belonging to the estate of Samuel C. Wallace were the lands which were in fact in the name of her father. Hence, we say, that even though it were shown, as it was not, that she received notice of the filing of the petition for the probate of this estate, nothing in that petition could disclose to her the fact that her father had owned land in South Dakota, and that she was then in fact the owner thereof herself. Had she even been aware of the fact that the decree of distribution did assign this land to appellant, it could have meant nothing to her, she not knowing that this land was then in the name of her father. We believe that the circumstances were not such as to cause anyone to make inquiry, much less such as would charge her with the duty of examining the records of Day County to ascertain whether or not her father had ever owned land there.

There is nothing, however, to indicate that respondent ever knew that the probate proceedings were had or that she ever obtained any knowledge of the contents of the final 'decree of distribution, and had she obtained such knowledge, yet there was nothing in it to put her on her inquiry. The only notice with which she could be charged, if any at all, is constructive notice.

To charge a party with constructive notice of a fact which could have been ascertained by inquiry, the circumstances known to him must have been such as ought reasonably to have excited his suspicion and led him to inquire. The general rule that constructive notice arises from facts placing on inquiry does not impute notice of every conceivable fact and circumstance, however remote, which might come to light by exhausting all possible means of knowledge." 29 Cyc. pages 114-115 and cases cited; 21 Am. & Eng. Encyc. pages 585 and cases cited; State v. Mellette, S. D., 92 N. W. 395.

For further exemplification of this rule see cases cited under foot note 25 Cyc., page 742; Knoedler v. Glaenzer, 55 Fed. 895, 20 L. R. A. 733; Conway v. Supreme Council California, 70 Pac. 223; McCarthy v. Mutual Relief Association, Petaluma California, 22 Pac. 933; Jamison v. Miller, Iowa, 20 N. W. 491; Guest v. Burlington Opera House Company, Iowa, 38 N. W. 158; Laub v. Trowbridge Adm'r, etc., Iowa, 32 N. W. 394; Dean v. Crall, Mich., 57 N. W. 813.

In the case at bar, instead of appellant having been caused to act to her prejudice, because of the silence of respondent, she was left in possession of said premises for a number of years, during which time, as shown by her evidence, she took the rents and profits and benefits from said land without returning anything therefor. No improvements were made upon this land. No moneys were spent other than directly for the purpose of raising crops and bringing about a benefit to appellant. So it appears to us that in this case, every one of the essential elements of an estoppel is lacking.

SMITH, J. Appeal from the circuit court of Day county. On May 17, 1887, Richard H. Smith and wife conveyed to Edward C. Wallace a quarter section of land in Day county, less a tract of about 10 acres previously conveyed for cemetery purposes, and less another tract of about 22 acres, previously transferred to the

Day County Agricultural Association. The sale and purchase on the part of Edward C. Wallace was transacted by Samuel C. Wallace, his brother. Samuel C. Wallace paid over the purchase price, and from the time of the delivery of the deed to the time of his death, in 1902, rented the land to tenants, collected the rents, and generally controlled the disposition and handling of the land. Edward C. Wallace, the purchaser, was never in South Dakota. The land was assessed in the name of Samuel C. Wallace and his estate and widow from 1888 to 1909, inclusive, and all taxes were paid by Samuel C. Wallace and Diana E. Wallace, his widow, or by some one for them. On January 15, 1898, the 22 acres of the quarter section formerly deeded by Smith to the Day County Agricultural Association was purchased by and deeded to Samuel C. Wallace. On May 10, 1900, Samuel C. Wallace made his last will and testament, devising all his property to his wife, Diana E. Wallace, the plaintiff, and naming her as sole executrix. The will does not specifically describe the land in controversy, or any other land or property devised, but is a general devise of "all my real and personal property of every name and nature of which I may die possessed." The will was duly probated, notice thereof being mailed on July 10, 1902, to the heirs named in the petition; Lena Wallace Cunningham, daughter of Edward C. Wallace, being named as one of the heirs. Probate proceedings were conducted to a final decree of distribution, in which the land in controversy was assigned to the plaintiff Diana E. Wallace on September 24, 1903, and the decree recorded in the register of deeds office of Day county on September 27, 1910. Edward C. Wallace, the grantee named in the deed, died in 1897, 10 years after the recording of the deed. Lena Wallace Cunningham on April 27, 1910, filed in the county court of Day county a petition for administration of the estate of her father, Edward C. Wallace, alleging that the decedent was owner of the land, and the defendant George C. Dunton was thereupon appointed administrator. Thereafter the plaintiff Diana E. Wallace brought this action against Dunton as administrator and Lena Wallace Cunningham and others to determine adverse claim to the land. Lena Wallace Cunningham answered, claiming title to the land in herself. The trial court found: "(1) That consideration for the deed given by Richard H. Smith and his wife to Edward C. Wallace, dated

on the 17th day of May, 1887, and on said date duly recorded in the office of the register of deeds of Day county, * * * transferring and conveying the property in controversy in the above-entitled cause, was the money and property of the said Edward C. Wallace. (2) That the land in controversy has not prior to the commencement of this action been protected by a substantial inclosure. (3) That the land in controversy has not prior to the commencement of this action, and for a period of at least 20 years, been usually cultivated or improved, possessed, or occupied by said Samuel C. Wallace or Diana E. Wallace, the above-named plaintiff, or either of them. (4) That the occupancy of said premises by the said Samuel C. Wallace between the years 1887 and 1902, both inclusive, if any, was not adverse, or under a claim or right of title thereto, but that the same was had subject to and in subordination and recognition of the title of the said Edward C. Wallace."

The court further finds that the defendant Lena Wallace Cunningham is the sole heir at law of Edward C. Wallace, deceased, and as such became and is the owner in fee of the land in controversy, and is entitled to a judgment and decree quieting her title against the plaintiff. Appellant assigns insufficiency of the evidence to sustain the findings of fact and conclusions of law, and specifies fully and sufficiently the particulars in which the evidence is alleged to be insufficient. The assignment which is vital to appellant on this appeal is that the evidence is insufficient to sustain the finding of the trial court that the consideration for the deed from Richard A. Smith and wife to Edward C. Wallace was the money and property of Edward C. Wallace. It is appellant's contention that this finding is contrary to the preponderance of the evidence, and that the trial court should have found that such consideration was paid by and was the property of Samuel C. Wallace.

Appellant cites and relies upon the provisions of section 303 of the Civil Code, which reads as follows: "When a transfer of real property is made to one person and the consideration therefor is paid by or for another, a trust is presumed to result in favor of the person by or for whom such payment is made." It is contended that Edward C. Wallace is holder of the legal title in trust for Samuel C. Wallace.

While this action is brought under the Code to determine adverse claims to real property, it is apparent that the issue can only be determined in plaintiff's favor by a decree adjudging that Edward C. Wallace holds such title as a resulting trust because payment of the purchase price of the land was made from the money of Samuel C. Wallace.

[1] It is the settled rule that the burden of establishing such a trust as against the holder of the legal title is on the party who asserts the trust. Keuper v. Mette, 239 Ill. 586, 88 N. E. 218; Cunningham v. Cunningham, 125 Iowa, 681, 101 N. W. 470; Lehman v. Lewis, 62 Ala. 129; Ecton v. Moore, 4 Ky. Law Rep. 307; Proctor v. Rand, 94 Me. 313, 47 Atl. 537; Veeder v. McKinley-Lanning L. & T. Co., 61 Neb. 892, 86 N. W. 982; Berla v. Strauss, 74 N. J. Eq. 678, 75 Atl. 763; Summers v. Moore, 113 N. C. 394, 18 S. E. 712. The burden of proof is on the party claiming the trust to prove that the purchase was made with money belonging to him. Millard v. Hathaway, 27 Cal. 119; Webb v. Webb, 130 Iowa, 457, 104 N. W. 438; Jones v. Hughey, 46 S. C. 193, 24 S. E. 178; Cottonwood County Bank v. Case, 25 S. D. 77, 125 N. W. 298. In the latter case, as stated in the syllabus, this court held: "One who claims that his money has been used to purchase land, title to which is taken by another, has the burden to establish it by clear proof." An extended review or discussion of the evidence adduced at the trial would serve no useful purpose and need not be attempted.

[2, 3] The evidence is sufficient to show that the money which was paid to Richard H. Smith as the purchase price of the land was in possession of and paid over by Samuel C. Wallace. Were it not for the fact that Samuel C. Wallace himself caused the deed to be taken in the name of Edward C. Wallace it would be a fair assumption, in the absence of other evidence, that the money in possession of Samuel C. Wallace belonged to him, but inasmuch as a resulting trust is never presumed from such a transaction, but must be proved by him who alleges it, we think that when Samuel C. Wallace paid to the seller money in his possession, and took the deed in the name of Edward C. Wallace, it may be fairly presumed, in the absence of other evidence, that the money was the money of Edward C. Wallace. In any event, it is clear that the transaction itself can hardly be viewed as presenting a

preponderance of evidence in favor of plaintiff's claim to the money which was the purchase price of the land. The only affirmative evidence in the record which can be considered as having any bearing, direct or indirect, upon the question of the ownership of the fund or of the land purchased with it consists of the testimony of five witnesses who testified, in substance, that they had heard Samuel C. Wallace say that he did not own the land in controversy, but that it belonged to his brother, and also the testimony of one witness who testified on behalf of plaintiff that at the time the deed was executed Samuel C. Wallace claimed the land was his, and that he was taking title in the name of his brother, and of one or two other witnesses who testified to statements made by Samuel C. Wallace in his lifetime to the effect that the land belonged to him. It is conceded that Edward C. Wallace resided in New York, and never was in the state of South Dakota, and the record is silent as to any claim to this land ever having been made by Edward C. Wallace or his heir, Lena Wallace Cunningham, until about the time probate proceedings were instituted. There was also testimony in the record tending to show that Samuel C. Wallace said he had made certain remittances of $100 per year to his brother Edward C. Wallace, arising out of the rentals or use of the land itself.

Appellant contends that, under the evidence in the record, defendant should be held barred by the 20-year statute of limitations from claiming any right, title, or interest in the land in controversy. It is conceded that from the time the land was purchased in 1887, up to the time of his death in 1902, Samuel C. Wallace controlled and leased the land, and that Diana E. Wallace, plaintiff's widow, devisee of Samuel C. Wallace, exercised similar control over the land up to the time of the trial of this action. It is also conceded that the land was assessed in the name of Samuel C. Wallace from 1888 to 1909, and that the taxes were paid by him and his surviving widow. But, as we have seen, the trial court found that the land in controversy was the property of, and was purchased with money of, Edward C. Wallace, and that the occupation of the premises between the years 1887 and 1902, both inclusive, was not adverse, hostile, or under a claim or right or title thereto, but was in subordination to the title of Edward C. Wallace.

[4]   The burden of showing title to the property by adverse possession rests upon the plaintiff, and the record fails to show any sufficient evidence of adverse claim upon which to found such title.

[5]   The court having found that Edward ·C. Wallace was the owner of the property in dispute, and that the possession of Samuel C. Wallace was in recognition of and subject to the title and ownership of Edward C. Wallace, it is entirely clear that Samuel C. Wallace could acquire no adverse right, title, or interest in said property by reason of the fact that he leased and controlled the property, and that it was assessed in his name, and that he paid the taxes thereon, even during a long series of years.

[6, 7]   Appellant further contends that, upon the facts disclosed in the record, the defendant should be held estopped by laches from now claiming title to the property in controversy.   It might be sufficient to note the fact that no estoppel is pleaded in the plaintiff's reply to defendant's counterclaim.   But, regardless of the want of proper pleading, the evidence itself is not sufficient to establish an estoppel by laches under the rule contended for by appellant.   Appellant's statement of facts nowhere shows that Samuel C. Wallace expended money for or made improvements on the land, or did any act hostile or detrimental to the legal title vested in Edward C. Wallace by the deed.   The case at bar is not within the facts or the principles involved in the cases of Shelby v. Bowden, 16 S. D. 531, 94 N. W. 416; Murphy v. Dafoe, 18 S. D. 42, 99 N. W. 86; Wampol v. Kountz, 14 S. D. 334, 85 N. W. 595, 86 Am. St. Rep. 765.   So long as Samuel C. Wallace was in possession and control of the land in subordination to the legal title of Edward C. Wallace, and committed no act hostile to such title, mere silence on the part of Edward C. Wallace could never give rise to an estoppel by laches as against him.

Counsel for appellant and respondent have analyzed and discussed with great care the effect and probative weight which should be accorded the testimony of each witness and of each fact disclosed in the evidence, but we deem it unnecessary to attempt · a review of the evidence or of such discussion.   It is sufficient for the purposes of this appeal to say we have reviewed with much care the discussion of counsel and the entire evidence in the record.   We are not convinced that the findings of the trial court are

against the preponderance of the evidence, and therefore, under the well-settled rule of this court, we do not feel at liberty to disapprove the findings of the trial court.

We are inclined to the view that the findings and judgment of the trial court should be affirmed. It is so ordered. ·